F8E5dnaC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DNA HEALTHCARE, INC.,

4                  Plaintiff,

5          v.                                15 Civ. 6086 (JSR)

6   DHRUV SIKKA and SIKKA
    HOLDINGS, LLC,
7
                  Defendants.
8
    ------------------------------x
9                                           New York, N.Y.
                                            August 14, 2015
10                                          11:30 a.m.

11  Before:

12                      HON. JED S. RAKOFF,

13                                          District Judge

14                          APPEARANCES

15  ELIZABETH SHIELDKRET, ATTORNEY AT LAW
         Attorneys for Plaintiff
16  BY:  ELIZABETH SHIELDKRET

17  SCHWARTZ & THOMASHOWER, LLP
         Attorneys for Defendants
18  BY:  RACHEL SCHWARTZ
         CARLA SERENY
19

20

21

22

23

24

25

F8E5dnaC

1          THE DEPUTY CLERK:  Will the parties please identify

2     themselves for the record?

3          MS. SHIELDKRET:  Elizabeth Shieldkret for the

4     plaintiff DNA Healthcare, Inc.

5          THE COURT:  Good morning.

6          MS. SHIELDKRET:  Good morning, your Honor.

7          MS. SCHWARTZ:  Good morning, your Honor.  Would you

8     prefer that I stay seated?

9          THE COURT:  That's all right.

10          MS. SCHWARTZ:  My name is Rachel Schwartz from the Law

11     Firm of Schwartz & Thomashower with my colleague Carla Sereny.

12     We are here for the defendants, Dhruv Sikka and Sikka Holdings,

13     LLC.

14          THE COURT:  Good morning.

15          Before we get to the TRO, did you prepare a case

16     management plan?

17          MS. SCHWARTZ:  Your Honor, Ms. Shieldkret and I

18     conferred last night, exchanged drafts and conferred again this

19     morning.  We do have one with my handwritten notes on it.

20          May I read you the dates?  And we have an application

21     with respect to it.

22          THE COURT:  Hang on.  Let me get out my copy.  Okay,

23     first, is it jury trial or not?

24          MS. SCHWARTZ:  I believe the plaintiff has requested a

25     jury trial.

F8E5dnaC

1          MS. SHIELDKRET:  Yes, your Honor.

2          THE COURT:  Does anyone anticipate any additional

3    parties?

4          MS. SHIELDKRET:  We don't, your Honor.

5          MS. SCHWARTZ:  We do not either, your Honor.

6          THE COURT:  Amended pleadings without leave of Court?

7          MS. SCHWARTZ:  The date that the parties have set is

8    11/8/16.

9          THE COURT:  Oh no.  No, no, no.  The amended pleadings

10   without leave of Court is designed just to get at typing errors

11   or something like that.  If you want to make substantive

12   changes, of course, that may or may not be contested.

13          MS. SCHWARTZ:  Okay.

14          THE COURT:  So, that will change that date to August

15   31st.

16          MS. SCHWARTZ:  Your Honor, we have not yet filed our

17   answer which is due on August 31st and we, defendant has an

18   application with respect to that --

19          THE COURT:  Yes.

20          MS. SCHWARTZ:  -- for a three-week extension of our

21   time to answer.

22          THE COURT:  Why?

23          MS. SCHWARTZ:  Why?  I will be out of town on the 31st

24   and I have two other briefs due before that.  I am going to

25   Florida to visit my 87-year-old mother so that's why we have

F8E5dnaC

1    asked.

2              THE COURT:  When are you leaving?

3              MS. SCHWARTZ:  I am leaving on the 28th.

4              THE COURT:  So what is going to happen between now and

5    the 8th?

6              MS. SCHWARTZ:  Well, I am assuming that we are going

7    to be writing papers for preliminary injunction motion and I

8    have another summary judgment brief due.

9              THE COURT:  When are you back?

10             MS. SCHWARTZ:  I am back on September -- Labor Day.

11             THE COURT:  So, I will give you to time to move -- or

12   answer is extended to September 18th.

13             MS. SCHWARTZ:  Thank you, your Honor.

14             THE COURT:  First request for production of documents.

15             MS. SCHWARTZ:  We said 9/18/15.

16             THE COURT:  Whoa, whoa, whoa.

17             You must know now, both sides must know now some

18   documents you want.  This is only a first request, it doesn't

19   preclude later requests.  Why don't we get that thing going

20   now?

21             MS. SCHWARTZ:  Fine.

22             THE COURT:  So, let's say August 21st.  Ditto for the

23   very limited interrogatories under Local Rule 33.3A, which are

24   the only interrogatories I permit.

25             MS. SCHWARTZ:  We appreciate that, your Honor.  Thank

F8E5dnaC

1    you.

2                    THE COURT:  Does either side anticipate experts?

3                    MS. SCHWARTZ:  Yes, your Honor.

4                    THE COURT:  What kind of experts?

5                    MS. SCHWARTZ:  I believe that there will be an issue

6    with respect to whether my client's program has any of the

7    plaintiff's source code in it so there will at least be experts

8    with respect to that.

9                    THE COURT:  Okay.

10                   MS. SCHWARTZ:  I believe the plaintiff has others to

11   add.

12                   THE COURT:  Let me hear from plaintiff's counsel.

13                   MS. SHIELDKRET:  Yes, we are going to need a source

14   code expert and I'm not yet sure what language their code is

15   written in so it may be a technical problem finding someone

16   whom is familiar with both.

17                   THE COURT:  What date do you suggest?

18                   MS. SHIELDKRET:  We also need damages expert, your

19   Honor.

20                   THE COURT:  What dates did you suggest?

21                   MS. SCHWARTZ:  The dates we suggest, your Honor, were

22   January 15th, 2016 and February 12th, but they're keyed into

23   our.

24                   THE COURT:  No way.  No way.  Forget it.

25                   Did you notice at the very top of the case management

F8E5dnaC

1    form I sent you it says, in boldface, In order to convey that

2    it is very serious, this Court requires that this case shall be

3    ready for trial on January 27th, 2016.

4            Now, that kind of timing I have applied in cases

5    involving dozens of parties, dozens of depositions,

6    international discovery, and you think you are going to escape

7    that here?

8            MS. SCHWARTZ:  Well, that was my -- I wanted to be

9    very clear, your Honor, we did read that and our initial plan

10   was keyed off of that and then we discussed it.  I have an

11   application with respect to that date which I would like to

12   make.  I would prefer, it is something of a personal nature,

13   that it not be in open court and we be able to approach the

14   bench.

15           THE COURT:  All right.

16           MS. SCHWARTZ:  Thank you, your Honor.

17           (Pages 7-8 SEALED by order of the Court)

18

19

20

21

22

23

24

25

F8E5dnaC

1          (In open court)

2          THE COURT:  So, we are back on the unsealed record.

3          We will move the ready-for-trial date six weeks so

4    that instead of January 27th, that would be March 9th.  Now,

5    going back to experts, what are the dates you had in mind?

6          MS. SCHWARTZ:  January 15th, and then for opening

7    experts February 12th for reply experts.

8          THE COURT:  Well, the proponent is going to be the

9    plaintiff, right?  So why do you need until January 15th for

10   your expert reports to be ready?

11         MS. SHIELDKRET:  Well, your Honor, I think there is --

12   we still don't know all of the experts that we could need.  We

13   really do need to get some more discovery and documents out of

14   them.  Our code is not -- one of the things I wanted to mention

15   is a lot of our witnesses are not in the U.S. if they want to

16   notice them up so that is going to be an issue.

17         THE COURT:  That's an issue but it has nothing to do

18   with experts.

19         MS. SHIELDKRET:  Well, it has to do with getting the

20   code -- getting the underlying fact discovery to be able to

21   give it to an expert.  So, we just wanted to build in that time

22   so we didn't have to ask for more.

23         THE COURT:  So, 1/15 and 2/11 was it?

24         MS. SCHWARTZ:  2/12.

25         THE COURT:  2/12, all right.  All depositions

F8E5dnaC

1   including expert depositions to be completed by?

2           MS. SCHWARTZ:  We thought it was the same day as the

3   case ready trial date; is that not correct?

4           THE COURT:  Excuse me?

5           MS. SCHWARTZ:  We weren't sure, is it the same as 3/9

6   or you do it earlier?

7           THE COURT:  Of course not.

8           MS. SCHWARTZ:  I wasn't sure, your Honor.

9           THE COURT:  It sounds to me like it would be 2/19, a

10  week after the final expert report is received because by that

11  time I presume you have done all the depositions except for

12  that expert.  So, request to admit January 19, all discovery to

13  be completed by February 19, moving papers on summary judgment

14  February 29th, answering papers by -- there is a February 29th

15  this year, by the way.

16          MS. SCHWARTZ:  My nephew will be very happy.

17          THE COURT:  Answering papers by March 11th, reply

18  papers by March 17th, and we will have a final pretrial

19  conference, let's look at March 24th.

20          THE DEPUTY CLERK:  March 24th, a Thursday, is a trial

21  day with nothing after yet.

22          THE COURT:  4:00 p.m. on March 24th.

23          So, instead of the ready-for-trial date being March

24  9th it is really now going to be, you can further extend it to

25  March 24th but I consider that a very firm date.

F8E5dnaC

1          MS. SCHWARTZ:  Thank you, your Honor.

2          THE COURT:  So, I have signed the case management

3    plan, it will be filed electronically and therefore available

4    to both sides.

5          Now let's talk about the TRO.  I will give the case

6    management plan to my courtroom deputy.

7          THE DEPUTY CLERK:  Thank you.

8          THE COURT:  So, as I understand it, plaintiff has a

9    non-compete agreement with the defendants and you believe that

10   despite assurances to the contrary, they are now competing and

11   soliciting clients that were or are yours; do I have that

12   right?

13         MS. SHIELDKRET:  Yes, your Honor.

14         THE COURT:  And, what is the response to that?

15         MS. SCHWARTZ:  The response is two-fold, your Honor;

16   that the non-compete is unenforceable.

17         THE COURT:  Why.

18         MS. SCHWARTZ:  Why?  The non-compete was backdated at

19   the plaintiff's insistence and it was drafted and presented --

20         THE COURT:  Did the defendant agree to it?

21         MS. SCHWARTZ:  May I tell your Honor what happened?

22         THE COURT:  Well, yes, but you can answer my question.

23         MS. SCHWARTZ:  The answer is my client showed up on

24   12/31 to pick up his final paychecks.  He had resigned from his

25   position.  He had a wife and child to support.  They presented

F8E5dnaC

1   him with his independent contractor agreement and refused to

2   release his final checks which included a bonus check and his

3   last two weeks of paychecks unless he signed this agreement and

4   that they both signed it on that date, Mr. Sreeram Mantha and

5   my client after much discussion about how it was incorrect that

6   this was a bonus, that he was entitled to this money.  They

7   refused to release the checks.  He signed it and he left.

8   There will be documentary evidence that will show the

9   discussions leading up to that point that my client's version

10  of the facts is correct --

11          THE COURT:  So legally, though, your claim is duress?

12          MS. SCHWARTZ:  Well, I don't know that it rises to the

13  level of duress, your Honor.

14          THE COURT:  So then what --

15          MS. SCHWARTZ:  I think there is an absolutely no new

16  consideration for this agreement whatsoever.  There was a

17  pre-existing obligation to pay the money.  There is no

18  consideration even on -- so, there is no consideration and

19  certainly we think under the law there is no adequate

20  consideration.  There is a two-week period and they're claiming

21  a 12 month non-compete and he worked for the plaintiff for four

22  years without any sort of employment agreement.  In fact, he

23  refused to sign one twice.

24          THE COURT:  So he was an employee at-will?

25          MS. SCHWARTZ:  He was an employee at-will.

F8E5dnaC

1          THE COURT:  But, he signed a contract and what did the

2     contract obligate them to do?

3          MS. SCHWARTZ:  He had no new consideration for it.

4     They were required to pay him this money anyway.  That's the

5     point.  They were tricking him because there is a history, your

6     Honor, to the story, which I think will provide some context.

7          THE COURT:  Okay.

8          MS. SCHWARTZ:  My client started working for DNA

9     Healthcare in 2010.  In June of 2014, very frustrated with the

10    failure to come back to him on compensation and to respond to

11    his request to become an equity owner in the company, he

12    announced to them that he was resigning, that he had an idea

13    for a multi-functional, interactive, care collaboration

14    platform called Notify which is the subject of the complaint

15    and this was in June and July of 2014, and that he had formed

16    another company and that he was going to leave their employ to

17    pursue this.  There were negotiations which are documented,

18    your Honor, between the parties starting in July where they

19    acknowledged that he owned it, that he was permitted to work

20    with them while he also launched this and while they continued

21    to negotiate with respect to their desire to buy into his

22    company, to get a piece of the software so that they would have

23    some percentage ownership, and they continued to negotiate over

24    the next many months.  Those negotiations are documented.  They

25    stalled, they restarted, my client was growing increasingly

F8E5dnaC

1    frustrated.  And let me just back up, your Honor.

2          The reason that they didn't want him to resign, they

3    worked out this long, nine-month transition period, is because

4    DNA Healthcare had just gotten a new revenue cycle management

5    contract with Bronx Lebanon and they needed him to deal with

6    that.

7          In November my client really had sort of had enough.

8    He told them that he was leaving, he was resigning.  He

9    tendered his resignation, I believe it was on November to 20th,

10   2014, his last date was 12/31/2014.  It was an agreement he

11   would stay on and they would pay him.  There are documents

12   going back and forth about the bonus structure and how much he

13   was entitled to and they asked him to hold off announcing his

14   resignation to any of the clients.

15         There are continued negotiations on December 11th and

16   December 16th, the parties are exchanging proposals by which

17   they continue to work together, that one will buy -- my client

18   will buy into DNA, DNA would buy in and have a percentage of

19   Notify, that they would get some commission, a 6 or 7 percent

20   commission for sales of Notify to Bronx Lebanon and any other

21   DNA clients.

22         When those negotiations failed on the 16th, my client

23   sent out his resignation; he announced it.  He was asked on

24   December 19th to turn in his laptop and all of his keys and to

25   return all of that and there is a document to show that he did

F8E5dnaC

1   it.  And he was told to take the rest of the time off and he

2   arranged, via text message, to come in to pick up his final

3   check on the 31st whereby they presented this agreement.

4           Now, again trying to -- now they want to stop him from

5   competing with them in a business that they don't compete in.

6   And I think that's my second point, your Honor; that the

7   agreement is, we believe, is unenforceable for a number of

8   reasons and we --

9           THE COURT:  So far you have only told me one which is

10   lack of consideration.

11           MS. SCHWARTZ:  Lack of consideration.  There is no

12   geographical restriction.  It is vague as to what he can do.

13   And so putting aside that, those are the reasons, we do not

14   believe and we think that the evidence is going to show this

15   very squarely, these are not competing businesses.

16           DNA Healthcare is primarily, and if you look at their

17   website you see it, primarily an RCM.  They deal with revenue

18   cycle management in the health care industry -- and I am just

19   learning this -- which means that they deal with billing and

20   coding and getting providers paid for the services that they

21   do.  They mostly provide the platform through a subcontractor

22   to perform those services.  They have -- and they do some IT

23   support.  As part of that, at Bronx Lebanon they have Member

24   Tracker which is essentially a one-function application which

25   is an e-mail notification service that alerts a provider if one

F8E5dnaC

1      of the patients has been to see another provider.  They are not

2      care collaborators, they do not work in that industry.  My

3      client's platform is a, I think I said it, it is a

4      multi-functional, interactive, patient care collaboration

5      software platform that allows providers to communicate in

6      real-time and coordinate patient care.

7              What is very significant about this, your Honor, to

8      show that they're not competing in competing businesses, in

9      February of 2015 Bronx Lebanon sent out a request for proposal

10     to health IT providers in the industry looking for care

11     collaboration platforms.  DNA Healthcare was not invited to

12     participate in that RFP and my client -- this is after he has

13     already left, spoke with Mr. Sreeram Mantha who is a principal

14     at DNA Healthcare and Mr. Mantha said, yes, we were not invited

15     to participate.  We do not have that capability.  We do not do

16     that.

17             My client was invited to participate in the RFP.  He

18     didn't get it because he was too small.  And they do very, very

19     different businesses.  The platforms are completely different,

20     one is an RCM, primarily, and there is no claim that they have

21     this capability, completely different platforms.  So, we do not

22     believe that even if the agreement is enforceable, your Honor,

23     that there is any breach and there certainly is no urgency with

24     respect to this.  They've known about this for a long time

25     because my client has been referring RCM business to DNA

F8E5dnaC

1    Healthcare because he is not interested in pursuing that line

2    of business.  His only focus is in building this care

3    collaboration platform which is totally different than what DNA

4    does.  Now they are trying to stop it.

5              I think what is very important for your Honor to know

6    is that Mr. Sikka, my client, and Dr. Ram Kairam, had a very

7    personal relationship.  My client was his protegee, Dr. Kairam

8    was his mentor.  On June 20, 2015 my client met with

9    Dr. Kairam.  Dr. Kairam admitted that he had no ownership

10   interest in Notify.  He told my client I don't care what you do

11   with Notify but what he said to him was:  You are someone who

12   has bit the hand that fed you and you must face the

13   consequences.  And he has made comments to that effect over the

14   course of the many months that he is angry at Mr. Sikka for

15   having developed this which he did on his own time outside the

16   scope of his employment, and which DNA Healthcare agreed to let

17   him do while working on parallel tracks and that's documented,

18   and that he is using this lawsuit to really shut down my client

19   who is a single, sole-proprietor who is trying to launch a

20   business who hasn't had a salary in eight years and we believe

21   that he is using this court case to stop him.

22             THE COURT:  All right.  I get the point of your

23   argument.  Let me hear from your adversary.

24             MS. SHIELDKRET:  Your Honor, there are obviously a lot

25   of facts in dispute here and there are a lot of things I think

F8E5dnaC

1    that are just inaccurate.

2              There was business that Mr. Sikka solicited before

3    Bronx Lebanon that was RCM business directly, in fact it was a

4    question of switching over a contract from my client to him.

5              The first thing is there is a signed contract here, it

6    is Exhibit 1 to the complaint, it is Exhibit 1 to the Mantha

7    declaration.

8              THE COURT:  Bear with me just one second, I want to

9    look at that agreement.

10             MS. SHIELDKRET:  Sure.

11             THE COURT:  So it appears to be open-ended in terms of

12   the dates on which services are to be performed, yes?

13             MS. SHIELDKRET:  I'm sorry the contract was --

14             THE COURT:  This is the first time I have looked at it

15   so maybe I am missing it.  It says:  20, Term of Agreement.

16   The term of this agreement shall commence from the date it is

17   executed by contractor -- the contractor being Mr. Sikka.  All

18   terms and conditions shall remain in force during and in all

19   periods for which contractor services are provided to the

20   client under this agreement.

21             So, it doesn't say how long the agreement is for, does

22   it?

23             MS. SHIELDKRET:  Yes, your Honor.  In Appendix A what

24   defines the actual scope of the work that was to be done, it

25   has a start date of 12/16/2014 and an end date of 1/31/2014.

F8E5dnaC

1                THE COURT:  Where is that?

2                MS. SHIELDKRET:  That is the third page of the

3        document, appendix A.

4                THE COURT:  Okay.  So, I am looking -- I see.

5        Engagement period, start date 12/16, end date 12/31.  So, it is

6        a grand total of 15 days.

7                MS. SHIELDKRET:  Yes, your Honor.

8                THE COURT:  That's, frankly, suspicious on its face.

9                MS. SHIELDKRET:  So, what happened was Mr. Sikka came

10       to my clients and said I have been working as an employee but

11       I'm starting my own company.  I would like to have, for the

12       year 2014, some income for my company against which I can

13       deduct expenses, will you put me on as a 1099 contractor

14       instead of as an employee.  And they agreed.  And it says right

15       here, he was paid $18,000 for that two-week period.  And as she

16       said, he didn't have to come in to work for that.  So, there

17       was additional consideration for this contract.  He received a

18       check --

19               THE COURT:  So, first of all, is it your position this

20       was signed on the 15th or the 31st?

21               MS. SHIELDKRET:  The 31st, your Honor.  We agree with

22       that.

23               THE COURT:  So it is, forgive me, a falsely backdated

24       contract but of course both sides at least in some sense agreed

25       to it.  But that doesn't make it any less inaccurate.  It

F8E5dnaC

1  doesn't say this would have been permissible that this contract

2  is executed as of the 15th, you sometimes see that.  But, no,

3  it says this agreement is executed this 15th day and then both

4  sides, at the end sign it 12/15/14.  Actually, that appears --

5  yes.  So, assuming they both inserted that date they would both

6  be, I guess the term of art would be, liars.  Both.

7          Now, the next thing is in return for this $18,000 on a

8  1099 he is agreeing, assuming this is a valid contract, to a

9  non-compete for 12 months, right?

10          MS. SHIELDKRET:  Correct.

11          THE COURT:  So, what you are really saying if I

12  understand your position as opposed to your adversary's, your

13  position is he wasn't owed anything along the 31st?

14          MS. SHIELDKRET:  He worked at the company as an

15  employee through, I believe, December 15th, and he was paid, I

16  believe, on normal payroll cycle for his work through the 15th.

17  And then for the rest of December he was paid on a 1099, an

18  additional --

19          THE COURT:  But that was retro -- in retrospect he

20  worked during that two-week period without any arrangement

21  other -- had he resigned?  No.

22          MS. SHIELDKRET:  Yes, your Honor.  Resigned on

23  November 20th, I believe.

24          THE COURT:  I see.  So, it was unclear what his status

25  was but he was performing -- how much was he paid per two

F8E5dnaC

1    weeks, previously?

2              MS. SHIELDKRET:  That's in the papers, your Honor.  I

3    believe his base salary was $140,000 which would make a

4    two-week cycle $2,900.

5              THE COURT:  So he is getting a lot more --

6              MS. SHIELDKRET:  I'm sorry, a week, $2,900.  A

7    two-week cycle would be almost $5,800.

8              THE COURT:  Roughly $6,000, so you are saying he is

9    getting three times what he would have gotten if he was just

10   being paid for two weeks but maybe he was paid for more than

11   two weeks.  What was the last check he received prior to this?

12             MS. SHIELDKRET:  I believe it was December -- it was

13   through his work for December 15 and I believe it was done as a

14   payroll, may have been a direct deposit, not a check.

15             THE COURT:  Okay.  That's fine.

16             So, if he were paid through December 15th and then he

17   worked through December 31st, he would be entitled on a, if you

18   will, sort of quantum meruit approach, to $2,900 is what you

19   are saying.

20             MS. SHIELDKRET:  I'm sorry.  I think I misspoke, but

21   like $5,800.

22             THE COURT:  That is what you say, pardon me.  $5,800.

23   Instead he is getting $18,000.

24             MS. SHIELDKRET:  Correct, your Honor.

25             THE COURT:  And you are saying he is getting $18,000

F8E5dnaC

1   so that he can deduct against that certain expenses, that's why

2   he wants it in the form of a 1099 --

3           MS. SHIELDKRET:  That was our understanding.

4           THE COURT:  -- or arguably a fraud on the IRS, but

5   maybe not.

6           And in return you are getting a one-year non-compete.

7           MS. SHIELDKRET:  Correct, your Honor.

8           THE COURT:  So, of course this agreement on its face

9   doesn't purport to be anything like that but we have competing

10  views of all that is really going on.

11          MS. SHIELDKRET:  May I just give some factual

12  background there?

13          THE COURT:  Yes.

14          MS. SHIELDKRET:  My client had previously -- this is

15  someone who worked at the company for 10 years and was in

16  charge of day-to-day management of many matters at the company.

17  My client had, on other occasions, hired 1099 employees and had

18  agreements like this with them, with those employees.  So when

19  he suggested himself, when he asked to be put on as a 1099

20  employee he knew what was involved, he knew that that was

21  customary at the company to have this kind of agreement with a

22  non-compete and he negotiated with them about it.  It didn't

23  just happen.  We have a disagreement about the idea that he

24  turned up and it was a take it or leave it proposition.

25          THE COURT:  Who drafted the agreement?

F8E5dnaC

1          MS. SHIELDKRET:  My understanding was that Mr. Mantha

2     presented him with an agreement.  Mr. Sikka rejected it.  They

3     negotiated and it went back and forth and Mr. Mantha put in

4     changes.

5          THE COURT:  All right.

6          So, now what about this business that -- I think you

7     have already said that in your view he is directly competing

8     for some of your client's business?

9          MS. SHIELDKRET:  Right.  Well, he doesn't deny that he

10    is competing and --

11         THE COURT:  Well, they're saying he is competing for

12    different business.  He is not denying that he is negotiating

13    with one of your clients but what he is denying is that it is

14    the same business.

15         MS. SHIELDKRET:  He admitted earlier this year that he

16    negotiated for the RCM business at Bronx Lebanon which was

17    directly competitive with my client.  He has admitted that.

18         THE COURT:  Admitted it in what form?

19         MS. SHIELDKRET:  Admitted it to Dr. Kairam, and I

20    believe that is paragraph 10 of Dr. Kairam's declaration.

21         THE COURT:  So, I don't see the need for any papers

22    here.  I see a need for an evidentiary hearing because what we

23    are hearing is two very different versions of what went on and

24    what its effect was, and it is already obvious to the Court

25    that there will be credibility issues here and the Court, just

F8E5dnaC

1    on the basis of what it has seen already, has at least some

2    question in its mind about whether either of these folks is

3    capable of telling the truth.  But, we will find out.

4              MS. SHIELDKRET:  Your Honor, I would just like to

5    point out that the reason we brought this application was

6    because Mr. Mantha was at the client on Monday and saw a

7    proposal from Notify on the desk of a decision-maker at the

8    client.  That's paragraph 20 of Mr. Mantha's declaration and

9    Ms. Schwartz' representation about my client's product is just

10   not true.  They both perform the same function of notifying

11   care givers that someone has shown up and they're seeking other

12   care and the caregivers need to coordinate.  What she is

13   talking about, the difference he claims --

14             THE COURT:  So that's fine.  So.

15             MS. SHIELDKRET:  But.

16             THE COURT:  Excuse me.

17             So, when is the earliest you would be ready for an

18   evidentiary hearing which, presumably, would involve your

19   client, maybe one of -- another witness to events and someone

20   from the entity that your adversary is negotiating with.

21             MS. SHIELDKRET:  We submitted our papers this morning

22   and whenever your Honor can hear us.

23             THE COURT:  I'm sorry.  I didn't know that we had set

24   that schedule but let me ask my law clerk.  Did we set a

25   schedule for papers?

F8E5dnaC

1          LAW CLERK:  No.

2          THE COURT:  I haven't seen your papers either.

3          MS. SHIELDKRET:  I have a courtesy copy, your Honor.

4          THE COURT:  But I didn't want papers.  I thought we

5     would swiftly move to an evidentiary hearing.  I thought that

6     would be what you would want; if in fact your allegations are

7     true that you want immediate relief.

8          MS. SHIELDKRET:  We would like an evidentiary hearing,

9     your Honor, but we do want to stress that there is a time

10    component to this and we are asking for a TRO because --

11         THE COURT:  That's why I didn't want papers, because

12    if, for example, you were ready to go forward with an

13    evidentiary hearing on Monday, then I was going to ask your

14    adversary whether her client would voluntarily agree to do

15    nothing between now and Monday night.  Alternatively I could

16    order that.  But I always prefer to -- and I don't want to have

17    him spend a busy weekend wasting his time if it turns out to be

18    a waste of time.

19         So, is your client willing to, in effect, have no

20    further negotiations, no conversations, nothing about this

21    whole business other than, of course, conversations with

22    counsel or any witnesses you need to line up between now and

23    close of business Monday?

24         MS. SCHWARTZ:  Your Honor, we will voluntarily accept

25    that we need a little bit more time.

F8E5dnaC

1              THE COURT:  Okay.

2              MS. SCHWARTZ:  Yes.

3              THE COURT:  The price of more time --

4              MS. SCHWARTZ:  I understand.

5              THE COURT:  It is the same agreement.

6              MS. SCHWARTZ:  I understand.  That's fine.

7              THE COURT:  How much time would you like?

8              MS. SCHWARTZ:  May I have a moment?

9              THE COURT:  Yes, sure.

10             (Counsel conferring)

11             MS. SCHWARTZ:  So, not next week, the following week?

12             THE COURT:  Okay, let's look at Monday the 24th.

13             THE DEPUTY CLERK:  That's a trial day, Fazio v.

14     Ranestorm, and actually you are supposed to be at the MDL panel

15     in Denver.

16             THE COURT:  Oh yes.  That's right.

17             MS. SCHWARTZ:  Can we make it the Wednesday, your

18     Honor?

19             THE COURT:  No.  Well, maybe.

20             THE DEPUTY CLERK:  You are back as far as calendar.

21             THE COURT:  I am back on Wednesday?

22             THE DEPUTY CLERK:  Yes, your Honor.

23             THE COURT:  We don't start the other trial until

24     Thursday, the Lavastone trial.

25             THE DEPUTY CLERK:  Lavastone, yes.

F8E5dnaC

1          THE COURT:  You are in luck.  So, Wednesday, August 26

2     at 10:00 a.m.  I will, since the papers have been filed by the

3     plaintiff I will accept them, but given the short time frame,

4     defense counsel, if you want to put in papers you can but you

5     are not required to, you can do it all orally on the 26th, if

6     you prefer.  So, it is totally up to you but if you want to put

7     in papers, put those in by the 24th so I will have a chance to

8     read them.  But, we will in any event, have a hearing on the

9     26th at 10:00 a.m., and on consent the defendants are barred

10    from entering into any further negotiations or agreements with

11    any of the customers that plaintiff alleges are covered by the

12    non-compete clause until close of business on the 26th of

13    August.

14         MS. SHIELDKRET:  Your Honor, may I ask that also cover

15    installing or running the software at the clients?

16         THE COURT:  I'm sorry?

17         MS. SHIELDKRET:  May I ask that that also cover

18    installing or running the software at the clients?

19         MS. SCHWARTZ:  We understand the scope of the

20    injunction, your Honor.

21         THE COURT:  Okay.  All right.

22         MS. SCHWARTZ:  We understand.  We are standing still

23    on Notify.

24         THE COURT:  Much appreciated.

25         MS. SCHWARTZ:  Your Honor, with respect to documents

F8E5dnaC

1    at the hearing, do you want them to be premarked?

2            THE COURT:  That would be nice, but I don't need to

3    see them in advance.

4            MS. SCHWARTZ:  Okay.

5            THE COURT:  If you want to provide them in advance,

6    that's fine too.

7            MS. SCHWARTZ:  Okay.

8            THE COURT:  I am going to be in Denver on the 24th and

9    25th.  I will make sure I read any papers that you submit but I

10   probably won't have a chance to look at any exhibits, so.

11           MS. SCHWARTZ:  I am on about the papers.

12           THE COURT:  Very good.  All right.  We will see you on

13   the 26th.

14                              oOo

15

16

17

18

19

20

21

22

23

24

25